UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROL JEPPESEN, | Case No. 1:25-cv-06069-JLR |
| *Plaintiff*, | COMPLAINT |
| - against- | |
| PRI US, INC., PRI ASSOCIATION, LORENZO SAA, LIAN HILLIER, LINDSEY WALTON, CAMBRIA ALLEN-RATZLAFF, | |
| *Defendants*. | |

Plaintiff Carol Jeppesen ("Jeppesen" or "Plaintiff"), by her attorneys Pryor Cashman LLP, as and for her Complaint against defendants PRI US, Inc. ("PRI US"), PRI Association ("PRI Association," collectively with PRI US, "UNPRI"), Lorenzo Saa ("Saa"), Lian Hillier ("Hillier"), Lindsey Walton ("Walton"), and Cambria Allen-Ratzlaff ("Allen-Ratzlaff," and collectively with Saa, Hillier, and Walton, the "Individual Defendants," and collectively with UNPRI, the "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.    This is an action for discrimination, retaliation, fraud, failure to accommodate, intentional infliction of emotional distress, and related statutory and common-law violations arising from Plaintiff Carol Jeppesen's employment and wrongful termination by PRI US, PRI Association, and current and former senior executives of both entities. A Wharton MBA with 25 years of experience in finance and deep capital markets expertise, Jeppesen was recruited to help establish the United Nation-Supported Principles for Responsible Investment's first dedicated U.S. office in Rockefeller Center, New York. Over nearly a decade, she helped build UNPRI's U.S. market into its largest and most strategically significant region, representing roughly half of the

1

$128 trillion in assets under management by its global signatories and generating its largest share of non-grant revenue, helping ensure the organization's financial stability.

2.     Despite her exceptional performance and contributions, Jeppesen was systematically marginalized; discriminated against on the basis of her gender, age, disability, and national origin; retaliated against after making protected disclosures to the company; and ultimately terminated in violation of New York State and City Human Rights Laws. Defendants' conduct was not only discriminatory, but it was also retaliatory, institutional, and unlawful.

3.     The hostile-work-environment arc began when Jeppesen's former supervisor Christopher Fowle ("Fowle") joined UNPRI in 2016.  Over the following years, Defendants failed to address substantiated workplace harassment by a senior male leader (Fowle), allowed him to resign without consequence, and then sought to silence discussion of the matter through fraudulent, coercive misrepresentations, designed to shield UNPRI and its management team from reputational harm. When Jeppesen continued to make repeated protected disclosures about systemic misconduct, governance failures, and significant legal and reputational risks, Defendants retaliated by suppressing her pay, isolating her from leadership roles, and eliminating her U.S.-based position in favor of a Canada–based "Head of North America" role, an act that served to dilute U.S. market representation.

4.     In 2018, Plaintiff retained legal counsel to compel compliance with New York law after Defendants attempted to enforce a legally insufficient U.S. maternity leave policy, an act that drew direct retaliation from senior leadership. Within 24 hours of a 36-hour labor and emergency C-section, she was coerced into conducting an interview from her hospital bed, and then was pressured to conduct a second interview the following day, in an effort to secure a replacement to fill her role while she was on maternity leave. Despite knowledge of this unlawful burden that was

placed on Jeppesen, UNPRI's People Team failed to intervene. Defendants further denied her reasonable caregiving accommodations and repeatedly blocked her from accessing a private, sanitary space to express breast milk for her baby with a life-threatening allergy.

5.      The late-2024 "redundancy" process that Defendants claimed justified Jeppesen's dismissal was a sham, affecting primarily older, senior employees and redistributing her duties to younger, less qualified and less experienced individuals—including her own former subordinate—while UNPRI continued recruiting aggressively for more than 40 positions in the months that followed. Although the term "redundancy process" is typically used to refer to the formal procedure a business follows to dismiss employees when their roles are no longer needed (typically due to financial difficulties or business restructuring), UNPRI used this process as a pretext to eliminate Jeppesen, on the heels of her protected disclosures.

6.      Defendants further damaged Jeppesen's professional standing by terminating her employment in a manner that appeared to be a termination for cause—abruptly cutting off her access to UNPRI's systems the same day (during the week of the U.S. Thanksgiving holiday and days before her 50th birthday) and treating her with abject hostility, while most other terminated employees were able to wind down their roles over the course of weeks. This irregular treatment caused confusion in Jeppesen's professional network and conveyed, both internally and externally, that her departure was not a routine redundancy.

7.      Through this lawsuit, Plaintiff seeks redress for the profound harm she has suffered because of unlawful conduct by UNPRI, an organization that holds itself out not only as a leader of responsible investment, but as its very architect, claiming to be the global arbiter of good practice on the Environmental, Social, and Governance ("ESG") framework. Through its more than 5,000 signatories, including public pension funds, sovereign wealth funds, universities,

hospitals, religious institutions, charitable foundations, insurance companies, and state and city treasuries, UNPRI claims that it represents more than half of the world's investable capital. UNPRI publicly promotes transparency, equity, human rights, and fair labor practices, while systematically failing to uphold those very same principles within its own operations. By retaliating against whistleblowers, using fraudulent misrepresentations to chill speech, and fostering a culture of fear, UNPRI not only harmed Plaintiff but also jeopardized the credibility of the responsible investment movement itself. This action seeks to remedy Plaintiff's injuries while serving the broader public interest of ensuring that those who expose misconduct are protected, rather than silenced.

## **PARTIES**

8.    Carol Jeppesen is an individual who currently resides at 657 Harrison Street, Denver, Colorado 80206. From October 2014 through March 2023—the relevant time period for many of the allegations alleged herein—she resided at One Lincoln Plaza, 20 West 64th Street, Apt. 42V, New York, New York 10023.

9.    Defendant PRI US is a Delaware corporation that has continuously maintained an office for the transaction of business in New York, New York since 2015. According to the New York State Secretary of State's Division of Corporations, PRI US holds an office at 142 West 57th Street, 11th Floor, New York, New York 10019. However, PRI US's current business offices are located at 575 Fifth Avenue, 14th Floor, New York, NY 10017. The Chief Executive Officer identified for PRI US Inc. in its New York registration is David Atkin, who also serves as the global CEO of PRI Association, demonstrating that PRI US operates under PRI Association's direct control.

10.    Defendant PRI Association (Companies House Company No. 07207940) is a

private company limited by guarantee (without share capital) that operates as the parent organization of PRI US. According to the U.K.'s Companies House, which is the U.K.'s government registrar of companies, its registered office is located at 1st Floor, 20 Wood Street, London EC2V 7AF, United Kingdom. Prior to that date, its registered office was at 5th Floor, 25 Camperdown Street, London E1 8DZ, United Kingdom, which was its address during Plaintiff's tenure with UNPRI.

11.    Defendant Lorenzo Saa held various roles within UNPRI from April 2009 through December 2022, when he ended his tenure with UNPRI as the Chief Signatory Relations Officer. He resides in London, United Kingdom. Upon information and belief, Saa is an Italian citizen and may also hold dual U.S. citizenship. Saa is currently employed as Chief Sustainability Officer of Clarity AI, a company headquartered in New York, New York.

12.    Defendant Lian Hillier is the Chief Operations & People Officer at UNPRI. She has worked for UNPRI since November 2016, previously serving as Director of People & Culture from November 2016 to October 2018, and as Chief People Officer from October 2018 to November 2024, before assuming her current role. She works in London, United Kingdom and resides outside of London.

13.    Defendant Lindsey Walton is UNPRI's Director of Americas, Responsible Investment Ecosystems at UNPRI, a position she has held since May 2022. From July 2020 to May 2022, she served a Head of Canada, Responsible Investment Ecosystems at UNPRI. She resides in Toronto, Ontario, Canada.

14.    Defendant Cambria Allen-Ratzlaff is UNPRI's Chief Responsible Investment Ecosystems Officer, a position she assumed in November 2024. She previously served as Chief Responsible Investment Ecosystem Officer for the Americas and Asia-Pacific from February

through November 2024. She resides in Michigan.

## JURISDICTION

15.     This Court has personal jurisdiction over Defendants PRI US, PRI Association, and the Individual Defendants under New York CPLR § 301 and § 302(a)(1) and (a)(3). Defendants have engaged in continuous and systematic business in New York sufficient for general jurisdiction under § 301, and have also transacted business and committed tortious acts within the state and outside the state causing injury to Plaintiff in New York, thereby satisfying the requirements for specific jurisdiction under § 302(a)(1)-(3).

16.      PRI Association transacts substantial business within New York, through its wholly owned subsidiary PRI US, which has consistently maintained an office in New York City since 2015. Specifically:

- 2015-2021: 45 Rockefeller Plaza, Suite 2000, New York, NY 10111;

- 2021-2022: 41 Madison Avenue, 31st Floor, New York, NY 10010 (Regus coworking);

- 2022-2025: 142 West 57th Street, New York, NY 10019 (WeWork); and

- Currently: 575 Fifth Avenue, 14th Floor, New York, New York 10017.

17.     In addition to conducting business through its consistent presence in its New York offices, UNPRI regularly leads events in New York for its various signatories and stakeholders, many of whom are based in New York. Specifically, throughout 2024 and 2025 (to date), UNPRI has held or participated in the following events in New York:

- TIIP Annual Symposium on System-Level Investing Conference in April 2024 and 2025;

- PEI Responsible Investment Forum in February 2024 and March 2025;

- Phenix Impact Summit in October 2024;

- Sustainable Investment Forum North America/UNEP FI in September 2024;

- PRI Signatory Roundtable & Governance Events in 2024;

- Asset Owner Event, jointly organized by PRI and For the Long-Term, and held in September 2024;

- New York Climate Week, held September 22-29, 2024;

- UNPRI's Global Board Meeting, held in June 2024;

- UN Global Compact Board Meetings, held in 2024;

- PRI CEO and other Executive Signatory Meetings, held throughout 2024;

- PRI Stewardship Signatory Update, held in 2024; and

- PRI Progression Pathways Signatory Consultation meeting.

18. Approximately 30% of UNPRI's U.S. signatories maintain their principal place of business in the State of New York and account for approximately 32% of U.S. signatory fee revenue. Founding signatories based in New York include the New York City Employees' Retirement System ("NYCERS"), the New York State Common Retirement Fund ("NYSCRF"), which invests on behalf of the New York State and Local Retirement System ("NYSLRS") and the United Nations Joint Staff Pension Fund. In addition to these founding signatories, some of the world's largest and most influential investors headquartered in New York are UNPRI signatories, including BlackRock, J.P. Morgan Asset Management, Blackstone, Goldman Sachs Asset Management, and KKR, as well as leading service providers such as MSCI and Bloomberg.

19. In light of the foregoing, and as outlined herein, UNPRI's purposeful activities directed at New York are substantial, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

20.     This Court likewise has personal jurisdiction over the Individual Defendants, as they have consistently engaged in purposeful activities directed at New York, through their roles with UNPRI.

21.     Defendant Lorenzo Saa is subject to personal jurisdiction in this Court pursuant to Fed. R. Civ. P. 4(k)(1)(A) and CPLR §§ 301, 302(a)(1)-(3). In his role as Chief Signatory Relations Officer from June 2015 through December 2022, Saa oversaw global signatory relations, including the U.S. market. Due to UNPRI's significant signatories within the State, Saa regularly met with key New York-based institutions, such as NYCERS, NYSCRF, J.P. Morgan, and Blackrock. Saa also supervised 3-5 New York-based employees as Chief Signatory Relations, including Plaintiff and her supervisor Fowle. Saa additionally approved the budget for the New York office and made compensation decisions affecting staff in New York. Finally, to attend to the foregoing aspects of his role—including conducting UNPRI business, managing signatory and personnel strategy, and overseeing the New York office—Saa typically traveled to New York at least once per year. After leaving UNPRI in December 2022, Saa was employed by Clarity AI, which has its headquarters in New York and serves clients, investors, and other stakeholders based in New York. In his role at Clarity AI, Saa regularly travels to New York to meet with clients and participate in professional events, including the Financial Times Moral Money Conference and New York Climate Week events.

22.     Defendant Lian Hillier is subject to personal jurisdiction in this Court pursuant to Fed. R. Civ. P. 4(k)(1)(A) and CPLR §§ 301, 302(a)(1), 302(a)(2), and 302(a)(3). In her role as Chief Operations & People Officer for UNPRI, Hillier frequently transacted business in New York. As head of UNPRI's global Human Resources enforcement and UNPRI's Finance and Operations, Hillier exercises policy authority, which covers all employment policies and decisions affecting

8

U.S. employees, including those in New York, and retains veto power over all U.S. hiring and firing decisions. Hillier also personally intervened in significant matters, including Jeppesen's formal grievance filing, which she then escalated to senior leadership. Specifically, Hillier was responsible for the following actions that directly caused harm to Jeppesen:

- implementing UNPRI's U.S. parental leave through 2018, then delaying the rollout of the new global parental leave policy, which resulted in Jeppesen's exclusion from the policy, and caused her direct financial harm;

- receiving—and ignoring—Jeppesen's concerns about her treatment by her supervisor Chris Fowle, including discouraging her from seeking formal resolution, failing to support her formal grievance filing, and overseeing the denial of her requests for mediation, thereby permitting the hostile work environment to persist unaddressed;

- failing to intervene during any of the many wrongs Jeppesen endured during her pregnancy and postpartum;

- denying Jeppesen's request to be able to work from home one additional day per week (for a total of two days per week), compared to the standard one day per week allowance that other employees were entitled to;

- overseeing the formal grievance process that Jeppesen lodged against Fowle; and

- ultimately carrying out Jeppesen's wrongful and discriminatory termination.

23.    Defendant Lindsey Walton is subject to personal jurisdiction in this Court pursuant to Fed. R. Civ. P. 4(k)(1)(A) and CPLR §§ 301, 302(a)(1)-(3). In her role as Director of Americas for UNPRI, Walton interacted with New York-based employees on a nearly daily basis, personally

oversaw all U.S. operations, which affected New York signatories, and participated in UNPRI leadership meetings in New York, including team meetings that were held offsite in 2022 and 2023 and the June 2024 Global Board Meeting and Signatory Roundtable Event at Wellington Management. She also led interviews and panel discussions on behalf of UNPRI at the Responsible Investor U.S. Conference in 2024 and at the PEI Responsible Investment Forum New York in 2025. Additionally, because Walton served as Jeppesen's direct line manager from May 2022 through her termination in November 2024, Walton played a critical role in the following conduct which serves, in part, as the basis for this Complaint and occurred during the time Jeppesen lived and worked in New York:

- making fraudulent misrepresentations to Jeppesen on UNPRI's behalf;

- suppressing Jeppesen's protected activity, including her whistleblower disclosures; and

- suppressing Jeppesen's pay in retaliation for the protected disclosures she made.

24.    Defendant Cambria Allen-Ratzlaff is subject to personal jurisdiction in this Court pursuant to Fed. R. Civ. P. 4(k)(1)(A) and CPLR §§ 301, 302(a)(1)-(3). In her role as UNPRI's Chief Responsible Investment Ecosystems Officer, in which she oversees UNPRI's activities in New York, Allen-Ratzlaff frequently travels to the State. Allen-Ratzlaff oversaw Jeppesen's management of various New York-based signatory relationships, including BlackRock, Blackstone, J.P. Morgan, NYSCRF, and NYCERS. Allen-Ratzlaff further participated in various events held in New York, including, but not limited to, co-hosting the Asset Owner Event with PRI and For the Long-Term, and held in September 2024, speaking on behalf of UNPRI at other New York Climate Week events in 2024, serving as a keynote speaker at the TIIP Systems-Level

Investing Conference in 2024, and presenting on the U.S. market and other topics during UNPRI's June 2024 Global Board meeting held in New York and co-leading the UNPRI Board / Signatory Roundtable event during that same week. In light of the foregoing, Allen-Ratzlaff necessarily directed her repeated, deliberate activities at New York.  In addition, her involvement in retaliating against Jeppesen—a New York-based employee for much of her tenure with UNPRI—in response to protected disclosures, as well as her role in Jeppesen's unlawful termination, establish sufficient contacts to subject Allen-Ratzlaff to specific jurisdiction in New York.

25.     These contacts conclusively establish both general jurisdiction under CPLR § 301 and specific jurisdiction under CPLR §§ 302(a)(1)-(3), as the Defendants have transacted business in New York and committed tortious acts causing injury within and outside the state.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because, as outlined in further detail in the remainder of the Complaint, a substantial part of the events giving rise to the claims occurred in the Southern District of New York. Alternatively, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3), because each of the Defendants is subject to the Court's jurisdiction.

## FACTS

### A. The United Nations-Supported Principles for Responsible Investment

27.     UNPRI is a global nonprofit initiative established in 2006 under the auspices of the United Nations. It was launched by then-UN Secretary-General Kofi Annan with a mission of fostering "good governance, integrity, and accountability" within the global financial system by encouraging responsible investment practices and promoting the integration of ESG factors into investment decision-making and active stewardship.

28.     The organization aims to support its signatories (investors and organizations that

have formally signed on to the UN-supported Principles for Responsible Investment) in incorporating ESG considerations into their own policies and practices, thus enhancing long-term value for beneficiaries and society at large. As of 2024, the PRI Association claimed over 5,000 institutional signatories, representing more than $128 trillion in assets under management. These signatories include some of the world's largest and most influential asset owners, investment managers and service providers, including Bloomberg, BlackRock, Vanguard, State Street, CalPERS, CalSTRS, NYSCRF, NYCERS, the World Bank Pension, and sovereign wealth and university endowment funds, among many others.

29.    Although UNPRI's global headquarters are located in London, U.K, the organization maintains a regional presence in the United States through PRI US, Inc., a wholly owned subsidiary incorporated in Delaware and based in New York City. UNPRI's frameworks are used as industry standards in ESG reporting, proxy voting, regulatory filings, and investment mandates, positioning the organization as a key global actor in shaping fiduciary norms and sustainability expectations across the financial sector.

30.    UNPRI also publicly champions high standards of internal and external conduct on labor rights, human dignity, and inclusive governance. The organization claims to: (1) support the UN Guiding Principles on Business and Human Rights, which establish a duty for businesses and affiliated institutions to prevent, mitigate, and remediate adverse human rights impacts; (2) align with International Labour Organization ("ILO") Core Labour Standards, including protections against discrimination, harassment, retaliation, and exploitation in the workplace; (3) promote diversity, equity, and inclusion ("DEI") in both investment practices and internal hiring, management, and workplace culture; (4) uphold the right to freedom of expression, whistleblower protection, and grievance mechanisms within organizational structures; and (5) advocate for fair

labor practices, including safe working conditions, equitable pay, and the right to organize or report wrongdoing without fear of retaliation.

31.     UNPRI's internal governance and HR policies (as described in its Whistleblowing, Human Rights, and DEI documents) claim to be rooted in the foregoing international frameworks and aim to reflect the same standards that UNPRI encourages its signatories to implement through their investment stewardship. For instance, in its public-facing materials, UNPRI states that it upholds the values of good governance, transparency, accountability, non-retaliation, and ethical integrity. According to UNPRI's own Serious Violations Policy, signatories who violate these principles—including those related to human rights and labor standards—may be subject to review and potential delisting.

**B.  Jeppesen's Employment with UNPRI**

32.     Carol Jeppesen is a senior executive in the sustainable finance sector with more than 25 years of experience spanning investment banking, asset management, private equity, and global responsible investment, including at Goldman Sachs and Merrill Lynch. She has led cross-divisional sales initiatives and managed capital raising and M&A advisory mandates across oil and gas, infrastructure, and emerging energy technologies, in addition to co-founding a private equity firm focused on distressed community banking institutions. Jeppesen holds an MBA in Finance from the Wharton School at the University of Pennsylvania, a dual BS/BA in Finance and Economics from Boston University, a CFA Institute Certificate in ESG Investing, a Chartered Alternative Investment Analyst (CAIA) designation, and was a member of the inaugural class of the Yale Sustainability Leadership Forum.

33.     In 2015, UNPRI recruited Jeppesen to help launch its first permanent U.S. office, located in New York City's Rockefeller Center. Over nearly a decade, she helped build and direct

UNPRI's operations in the United States, ultimately serving as Head of U.S. Responsible Investment Ecosystems. In that role, she led the expansion of UNPRI's largest and most strategically important market, growing the U.S. signatory base from approximately 200 to 1,100 institutional investors and service providers—representing nearly half of UNPRI's $128 trillion in global signatory assets under management. She personally secured marquee signatories such as the City of Chicago Treasury, Fidelity Investments, and Blackstone, and recruited and managed a high-performing national team of five direct reports—the largest team overseen by any UNPRI Country Head, globally.

34.    Throughout her tenure, Jeppesen was instrumental in strengthening PRI US, which contributed more than 25% of UNPRI's non-grant revenue. She cultivated relationships with asset owners, investment managers, consultants, data providers, and other stakeholders, regularly representing UNPRI at leading investment conferences in the U.S. and globally. Her work included direct engagement with C-suite executives, investment teams, and occasional interactions with regulators, positioning her as a recognized thought leader on ESG and sustainable investment across asset classes. Her professionalism, strategic insight, and integrity earned her broad respect among peers and senior figures across the responsible investment industry.

35.    Jeppesen consistently delivered exceptional performance. In June 2024, she was awarded a 1.10x competency rating—described by her manager, Lindsey Walton, as "beyond exceptional" and "hitting the ceiling" for her position—an increase from her already high 1.07x rating in June 2023. This rating, functioning as a salary multiplier against median benchmarked pay, reflected her sustained record of achievement. From 2021 through 2023, she met or exceeded all performance objectives.[1] Between 2016 and 2021, her 360-degree evaluations consistently

---

[1] No evaluation for 2024 had been completed at the time of her termination.

showed strong performance, culminating in an imputed score of 9.4 out of 10 in 2019 before the process was discontinued.[2] She was highly valued and respected by colleagues across the organization. In 2019, Jeppesen was promoted to Head of U.S. Responsible Investment Ecosystems. Despite assuming substantially expanded responsibilities, she received no corresponding salary increase.

### C. Jeppesen's Pregnancy & Maternity Leave

36.    In August 2018, Jeppesen informed UNPRI leadership that she was expecting a child in February 2019, making her the first U.S.-based employee at UNPRI to require maternity leave. Jeppesen also advised that her pregnancy was high-risk, which required heightened medical monitoring and placed her at increased vulnerability for complications. Accordingly, she requested reasonable accommodations. On both August 17 and 31, 2018, UNPRI's People Team confirmed in writing that, based on her tenure exceeding two years, Jeppesen qualified for UNPRI's U.K. maternity leave policy—consistent with the organization's public commitment, on their external facing website that all UNPRI employees, regardless of location, would receive equal parental leave benefits.

37.    On September 3, 2018, UNPRI abruptly reversed course, advising Jeppesen via email that she would be entitled to a separate, previously undisclosed, U.S. maternity leave policy, which offered only six total weeks of paid parental leave, with the first four weeks paid at 100% and the subsequent two weeks paid at 50% of an employee's regular salary. This policy made no mention of the 12 weeks of job-protected leave required under the federal Family and Medical Leave Act or New York State Paid Family Leave's guarantee of up to 10 weeks of job-protected, partially paid leave. Thus, UNPRI's maternity leave policy was not only inconsistent with federal

---

[2] Ratings varied year to year from a scale of 1-4, 1-5, and 1-10; Jeppesen's 9.4 out of 10 imputed score represents the proportional average of these scores from 2016 through 2021.

and state law, but also entirely inadequate given the seriousness of Jeppesen's medical needs. To make matters worse, UNPRI leadership refused to meaningfully engage in a dialogue about legal compliance or Jeppesen's wellbeing.

38.     As a result, Jeppesen was forced to retain legal counsel at her own expense to advocate for her right to a fair and lawful maternity leave. Her counsel advised her on engaging UNPRI leadership to challenge the organization's unlawful parental leave framework and emphasize the risks associated with denying proper accommodations under U.S. law. Only after this formal legal intervention did UNPRI take steps to revise its global parental leave policy. Despite her advocacy being the catalyst for this change, however, Jeppesen was explicitly excluded from the revised policy, underscoring the retaliatory nature of UNPRI's response.

39.     UNPRI leadership delayed recruitment for Jeppesen's maternity leave cover until mid-December 2018, forcing her to postpone her maternity leave by several weeks, due to excessive work demands, while in a medically documented high-risk pregnancy. In the early morning hours of Saturday, February 9, 2019, after an overly taxing work week and ten days before her due date, she experienced a premature rupture of membranes (PROM), endured 36 hours of labor, and underwent an emergency Cesarean section surgery delivery, followed by hospitalization and recovery. Plaintiff's doctors advised that her unrelenting work schedule may have led to her early labor.

40.     Less than 24 hours after this traumatic medical event, while still recovering in her hospital bed, she was coerced by UNPRI management to conduct interviews for candidates to fill her own role during her maternity leave. No steps were taken to defer or reassign the task, and UNPRI leadership showed no regard for her critical medical condition. This event occurred only ten days into her tenure as Head of U.S., under her direct line manager, Chris Fowle, who Jeppesen

was aware had advocated against her promotion. The sequencing of these events intensified the pressure Jeppesen faced to prove herself, even under these medically unsafe and unreasonable conditions. In an effort to be relieved of these duties, and for full visibility, Jeppesen included the People Team, including Hillier, in scheduling e-mails. However, they failed to intervene, leaving her to proceed with these tasks while recovering in the hospital.

41.     Upon returning from her maternity leave in January 2020, Jeppesen faced unsafe and dehumanizing lactation conditions at UNPRI's New York offices. Jeppesen was not provided with a private, sanitary space to express breast milk, as required by law, and instead was instructed to use a small second office that Fowle routinely occupied.  To avoid his presence while expressing breastmilk, Jeppesen navigated *ad hoc* arrangements, which most often included using the public unisex bathroom, a setup that compromised Jeppesen's physical comfort, privacy, and dignity. At the same time, Saa (UNPRI's Chief Signatory Relations Officer) denied Jeppesen's formal request to work from home one additional day per week following maternity leave, an accommodation that was routinely extended to U.K. employees. Jeppesen's request for this reasonable accommodation was made in an effort to alleviate the toll of managing her daughter's life-threatening cow's milk protein allergy and her own nursing and pumping requirements, particularly in light of the fact that she was repeatedly denied access to a designated lactation room at UNPRI's New York office.

42.     These failures were emblematic of UNPRI's broader disregard for her health and legal rights as a woman and new mother. Rather than ensuring a supportive return to the office following her maternity leave, UNPRI's actions further marginalized Jeppesen and reinforced the retaliatory culture that had taken root following her advocacy for lawful pregnancy, maternity, and postpartum accommodations.

**D. <u>Hostile Work Environment and 2021 Grievance Process</u>**

43.     From 2016 through 2021, Jeppesen endured a sustained pattern of workplace abuse by her direct supervisor, Chris Fowle. This included repeated acts of bullying, verbal aggression (often in the form of public screaming for extended periods of time), exclusion from meetings, gaslighting, demeaning, humiliating comments, threats of demotion, inappropriately blocking access to leadership opportunities and personnel, and undermining of her professional authority.

44.     In February 2017, shortly after Fowle joined UNPRI, Jeppesen respectfully approached him during a walk back from a signatory meeting to raise concerns about the way he had spoken to a signatory—taking credit for work she and her analyst had completed before his arrival and generally characterizing the organization as a "mess" prior to his arrival to "fix it." In response, Fowle screamed at Jeppesen on Fifth Avenue. The confrontation escalated and continued outside the entrance to PRI US's office building in Rockefeller Center, where the two remained for an extended period of time. The exchange became so intense that passersby began to gather and gawk. This experience was both frightening and humiliating to Jeppesen, who immediately reported the incident to Hillier. During that conversation, Hillier acknowledged the severity of the incident, noting that Jeppesen's voice was shaking. Nevertheless, she discouraged Jeppesen from proceeding to take formal action, asking whether she wanted to "deal with it in a way that was going to potentially hurt Chris's career." As a result, Jeppesen did not pursue further action at that time, which only served to perpetuate the abuse. Although Fowle later issued a weak apology, no meaningful corrective action was taken by UNPRI.

45.     In early 2020, Jeppesen met Saa in a New York City hotel to report the abuse she had been experiencing by Fowle before, during and after her maternity leave. Despite acknowledging her reports, Saa expressed disagreement or indifference, responding "but Chris is

just so good," and took no corrective action.

46.     Fowle's abuse intensified in frequency and severity during the COVID-19 pandemic, when remote work settings made oversight more difficult and the emotional toll more isolating. UNPRI leadership, including members of the People Team and Executive Team, were either aware or should have been aware of these dynamics, as the misconduct had been flagged in multiple forums by that point. Yet, they took no meaningful steps to protect Jeppesen, allowing Fowle's behavior to persist and escalate unchecked, further entrenching the hostile work environment.

47.     On March 18, 2021, Jeppesen submitted a formal internal report to UNPRI's People Team, including Hillier and People Partner Faye Baker, detailing the severe and ongoing abuse she was experiencing. She described escalating workplace hostility, emotional distress, and systemic dysfunction that was impairing her ability to safely and effectively lead the U.S. market, noting she feared retaliation if she provided candid feedback in Fowle's 360-degree performance review. This outreach triggered a follow-up meeting with the People Team on March 21, 2021, during which her concerns were acknowledged; however, still, no corrective action was taken by UNPRI. These communications made UNPRI's leadership fully aware of the misconduct well before any formal grievance was filed. The organization's failure to intervene or provide meaningful protection at this stage contributed to the long-term harm Jeppesen endured and reflects its deliberate institutional inaction.

48.     In October of 2021, Fowle informed Jeppesen that she would receive only a cost-of-living salary increase of approximately 4.4%, while multiple junior team members—each with substantially less responsibility, experience, and/or credentials—were awarded salary increases ranging from 8% to 22%. These pay decisions followed Jeppesen's substantial promotion to Head

of U.S. Signatory Relations, which had doubled her responsibilities and placed her in charge of UNPRI's largest global market, for which she had exceeded performance expectations and received high 360-degree performance review scores (including a 4.8/5 from Fowle himself). Rather than receiving recognition for her hard work and achievements, they were dismissed, and she was told she was performing at only an "adequate" level, that she lacked "star quality," and that she should find employment outside of UNPRI due to "bad institutional relationships" with UNPRI colleagues.

49.     On November 3, 2021, after Jeppesen became aware of and escalated a procedural breach of contract, with potential legal implications for UNPRI, Fowle verbally attacked her judgment and character, and once again threatened her job. Later that month, on November 10, 2021, Fowle expressly retaliated by signaling that he intended to restructure her role as a demotion to "Co-Head of U.S.," without merit or performance justification.

50.     At that point, and only after listening to irrefutable recorded evidence, the UNPRI People Team agreed to support Jeppesen in filing an official grievance complaint against Fowle. For the second time during her tenure, Plaintiff was compelled to retain her own legal counsel— again, at her own expense—to advise on her situation and grievance filing.

51.     As a result of this discriminatory conduct, Jeppesen experienced chronic emotional distress, including anxiety, insomnia, panic attacks, and physiological symptoms such as chest pain, heart palpitations, and elevated blood pressure. These symptoms were exacerbated by the fact that Fowle's verbal abuse was often delivered over video calls while Jeppesen was working from home in close quarters with her family during the pandemic, causing her additional humiliation.

52.     On December 15, 2021, after exhausting informal avenues and suffering years of

escalating abuse, Jeppesen filed a formal internal grievance against Fowle, documenting what amounted to a five-year pattern of workplace abuse, gender discrimination, and age-based bias (the "Grievance"), misconduct that senior UNPRI leadership and the People Team had long been aware of but refused to address. Still, rather than appoint an independent investigator, UNPRI assigned the matter to its own then-Chief Sustainability Officer, Shelagh Whitley, whose fiduciary role created an inherent conflict of interest, deprived the process of independence, shielded senior management from accountability, and laid the foundation for subsequent retaliation against Plaintiff.

53.    On February 3, 2022, UNPRI formally substantiated the Grievance, affirming Fowle had engaged in a repeated pattern of aggressive behavior and bullying, policy violations, and actions that created a hostile work environment. Yet, instead of holding him accountable, UNPRI permitted Fowle to resign voluntarily, to remain on full payroll and benefits for over two months, and to quietly transition to a senior ESG role at Guardian Life Insurance. Two business days later, when Fowle resigned, UNPRI—through Saa and Hillier—imposed and enforced a verbal gag order, prohibiting Plaintiff from disclosing the Grievance, its outcome, or the circumstances of Fowle's departure.

54.    Also in February 2022, following years of record U.S. signatory growth, Jeppesen submitted a proposal for a separate "Director of U.S." position to provide U.S. signatories a voice in UNPRI's leadership. Plaintiff also expressed interest in the now-vacant Director of Americas position, following Fowle's departure.  However, Saa summarily rejected her proposal, told Plaintiff that she was "welcome" to apply for the vacant Director of Americas role, but conveyed that he did not view her as aligned with the profile he sought. He later warned that promoting her could create "bad external optics" and appear to "reward someone for filing a grievance." These

statements, paired with Jeppesen's knowledge of Saa's clear preference for "junior" candidates—who are "more moldable" and have more "runway"—caused Jeppesen to reasonably conclude that, since Saa was the decisionmaker, applying for the role would be futile. True to form, in April 2022, Saa awarded the Director of Americas role to Walton, a significantly younger, less qualified, Canadian colleague.

55.    Bound by UNPRI's instructions to refrain from discussing the now-substantiated Grievance or the circumstances surrounding Fowle's departure, she was no longer able to easily explain her career trajectory to external recruiters, including why she had been passed over in favor of a less qualified colleague for the promotion, which was highly visible in a small, tightly knit sector. Thus, she became a less competitive candidate which impaired her ability to take the well-worn path that Fowle and many others had taken into lucrative private sector roles after leaving UNPRI.

56.    Prior to 2021, Jeppesen had been frequently solicited by recruiters for high-level ESG leadership roles with investors. Out of loyalty and alignment with UNPRI's mission, she declined most inquiries. However, by August 2021, the escalating hostile work environment at UNPRI, engendered by Fowle, had become untenable, prompting her to pursue the Global Head of ESG role at a prominent investment management firm. The position offered total compensation exceeding $500,000 but required relocation from New York. Jeppesen advanced from a pool of several hundred candidates to the final two in December 2021, completing more than 17 interviews, including two with the firm's CEO, while simultaneously enduring intensified abuse at UNPRI during the October-November 2021 period. Despite her qualifications and competitive performance, she was ultimately not selected. Jeppesen reasonably believes that the severe, medically documented stress, anxiety, and emotional harm caused by UNPRI's hostile work

environment materially impaired her candidacy, resulting in lost career advancement and significant financial harm.

57.     Following the substantiated Grievance, during a March 17, 2022 conversation, Saa openly acknowledged both UNPRI's and his own culpability, stating "It's the failure of the people around, including myself . . . I take full responsibility for this." He further admitted that Fowle had been privately spoken to about his improper behavior; however, despite this admission and immediately thereafter, UNPRI's retaliation against Plaintiff escalated.

58.     In anticipation of her team's first in-person offsite in New York following the COVID-19 pandemic in April 2022, and in response to information that Fowle had been contacting individual team members regarding social events while they were scheduled to be in New York, Plaintiff sought permission to inform her team about her substantiated Grievance. Saa reluctantly agreed, but wanted to control the narrative, rather than allow her to speak to colleagues on her own.  He therefore staged scripted two-on-one meetings (with Saa, Jeppesen and individual team members) in which he spoke from a script but frequently departed from the prepared remarks to minimize the severity of the abuse, stating "this isn't a witch hunt" and "we're not putting Chris up on a cross." These ad-libbed comments reframed the proven abuser as a victim, undermined the findings of the Grievance, and signaled to staff that Jeppesen's claims were exaggerated. These meetings were deeply humiliating to Plaintiff and further eroded her authority and credibility as a leader in front of her team and colleagues. During the same offsite, during a casual moment on the way to the subway, Saa pressed Plaintiff on whether she intended to pursue legal action against UNPRI and threatening that she "could be fired," after her husband—a UNPRI signatory representative—raised legitimate governance concerns and asked for accountability for the harm and "real world impact" UNPRI's failure to act had inflicted on his wife and their family. This

threat and minimization campaign not only chilled Plaintiff's ability to speak truthfully and undermined her credibility in front of her team, but also inflicted severe emotional distress on Jeppesen.

59.    In May 2022, shortly after the Grievance was formally upheld, Saa imposed a 10% reduction to Jeppesen's annual salary (worth $15,000) by unilaterally reducing her competency rating from 1.05x to 0.95x, despite the absence of any performance or competency-based justification. The only reasonable explanation for this conduct is that Jeppesen was being punished for the formal action she took within the organization to alleviate the abuse she was facing, a fact which Jeppesen repeatedly raised in meetings with her managers.

E.   **Fraudulent Misrepresentations: The July 22 Misrepresentations**

60.    On July 15, 2022, Jeppesen met with her direct managers Saa and Walton to raise concerns about her ongoing treatment and the attendant reputational, professional and psychological damage it was causing her. Specifically, she asked for permission to speak truthfully about the outcome of the Grievance and the circumstances surrounding Fowle's resignation from UNPRI. She explained that her prohibition from discussing the situation effectively forced her to mislead colleagues and external stakeholders about the nature of Fowle's departure and ultimately harmed her credibility within an organization she cared deeply about, causing serious psychological distress. She further emphasized that UNPRI's verbal gag orders were interfering with her ability to perform her role and heal from the institutional abuse she had endured. Also during this meeting, Jeppesen requested two reasonable pieces of accommodation: (1) access to a qualified, independent psychologist and (2) an external career coach of her own choosing, to deal with the psychological damage she had experienced. Plaintiff was assured that UNPRI leadership had already begun discussions with Hillier about her accommodation requests and would consult

legal counsel to evaluate her concerns. However, rather than engaging her in a transparent or good-faith process, UNPRI excluded her from further discussion and instead escalated its retaliation.

61.    Only one week later, on July 22, 2022, Saa unilaterally declared that Jeppesen's substantiated Grievance had "come to a rightful conclusion" and circulated a formal email, copying Walton and People Team representative Raluca Drosu, and enclosing two unsigned documents titled "Appendix 1" and "Appendix 2"(the "July 22 Misrepresentations"). In his email, Saa explicitly instructed Plaintiff not to reply, and the July 22 Misrepresentations, themselves, ordered her to avoid "long emails." The speech restrictions embedded in these documents were falsely presented as legally binding and allegedly based on legal advice from both U.S. and U.K. counsel. The July 22 Misrepresentations instructed Jeppesen to refrain from discussing the Grievance, Fowle's misconduct, or the conditions of his departure—internally or externally—and mandated she use evasive, scripted responses such as "I can't comment" or "The People Team can provide information," if asked. The July 22 Misrepresentations also contained a *post hoc* self-exoneration of Saa and the People Team, despite overwhelming evidence of misconduct and Saa's March 17, 2022 verbal admission that he and UNPRI had failed to intervene in the hostile environment.

62.    These misrepresentations were knowingly false—no legal counsel was ever identified, no confidentiality agreement was ever produced, and Jeppesen was explicitly warned not to reply or seek clarification. The People Team later reiterated the misrepresentations as binding and warned that violating them could result in disciplinary consequences. In effect, UNPRI created the appearance of formal legal mandates where none existed—fabricating institutional authority to silence a whistleblower and suppress the spread of information regarding a substantiated finding of abuse.

63.     Compounding the harm, Appendix 2 of the July 22 Misrepresentations introduced a financial mechanism titled an "exceptional retroactive mid-year review," which would be conducted by Walton six months later, in January 2023. At that time, Jeppesen would have the opportunity to restore her previous competency rating of 1.05 (from before the pretextual downgrade following the Grievance) and the attendant salary level, as long as she strictly complied with the speech restrictions. This created a system of financial coercion: if she spoke out, she risked professional discipline and further pay suppression; so, instead, she complied and suffered the pecuniary, reputational, and psychological damage that followed. If she ever did discuss the Grievance or Fowle's misconduct, she was treated as insubordinate and reprimanded, threatened, and ultimately financially penalized for the violation.

64.     At the time, Jeppesen reasonably believed the July 22 Misrepresentations to be legitimate and enforceable. She complied with them in good faith—only later learning, through independent legal counsel after her termination, that the restrictions were unlawful, had no legal basis under U.S. or U.K. law, and constituted a deliberate institutional fraud. The July 22 Misrepresentations not only silenced her voice (including inhibiting her from engaging counsel to formally pursue her legal rights and remedies), they also served as a turning point in UNPRI's retaliatory campaign, marking the formal institutionalization of a cover-up and a direct attack on her legal rights, professional reputation, and emotional well-being. Ultimately, as detailed below, much of the retaliation that Jeppesen later endured was pretextually attributed to alleged violations of the July 22 Misrepresentations.

## F.  <u>Whistleblower Disclosures</u>

65.     Beginning in 2021, risks to U.S. signatories escalated as anti-ESG political campaigns intensified, with state attorneys general, legislators, treasurers, and regulators issuing

inquiries, subpoenas, and examinations around investors' ESG practices—some resulting in fines, sanctions, and reputational damage, as well as accusations of antitrust violations. At the same time, UNPRI leadership was advancing a signatory reporting framework that aligned with the European "double materiality" approach, which requires investors to weigh social and environmental externalities ("real-world impacts") in addition to financial returns, rather than advancing a reporting framework aligned with the prevailing U.S. standards. Plaintiff and her U.S. team repeatedly warned that continued movement toward this Eurocentric approach conflicted with some interpretations of U.S. fiduciary duty, limiting fiduciaries to considering only pecuniary factors, and thus exposing U.S. signatories to heightened regulatory and political risk, particularly in Republican-led states that were restricting incorporation of ESG factors into investment decision-making. Despite clear and repeated warnings, UNPRI's leadership—comprised predominantly of non-U.S. personnel, some with activist backgrounds and limited investment experience—routinely dismissed these concerns as overstated or improperly motivated and treated U.S.-based staff who raised them as disruptive or difficult. In reality, the UNPRI employees (including and led by Jeppesen) who were advancing these concerns reasonably believed that UNPRI was negligently guiding its signatories to violate U.S. law and/or regulations, or to be exposed to accusations of such, and was therefore subjecting UNPRI to legal liability of its own, in addition to risking the loss of signatories, which could potentially have destabilizing financial consequences.

66.    In or around October 2022, during CEO Atkin's first visit to UNPRI's New York office, Plaintiff made a protected disclosure directly to him, warning him that the organization's culture discouraged staff from escalating negative feedback (including around signatory risks) due to fear of retaliation and stated that management's approach had created a chilling effect

undermining transparency, accountability, and governance, and exposing both UNPRI and its signatories to legal, compliance, and fiduciary risk. The CEO acknowledged the feedback but took no responsive action.

67.     Subsequently, UNPRI escalated its retaliatory treatment of Jeppesen (as the primary escalation channel and mouthpiece for nearly 1,100 U.S. signatories), maintained the gag orders found in the July 22 Misrepresentations, continued to isolate her from achieving senior roles and advancement, excluded her from decision-making, and prepared the groundwork for her eventual termination. Jeppesen also faced retaliation in the form of frequent reprimands directed at herself and her team members for "tone," as well as accusations of being "overly emotional" or "disrespectful of Executive Team members' time." Walton repeatedly expressed concern that an older colleague—who had attempted to escalate signatory concerns around reporting and other topics with a frustrated tone—might be "burned out," a characterization that appeared to function as coded language suggesting he was no longer fit for his role due to advanced age. Walton suggested that his tone violated the PRI Culture Charter, but was dismissive of the substance of his feedback, which reflected important concerns raised by major U.S. signatories. Rather than addressing those concerns, Walton repeatedly pressured Jeppesen to confront him about his demeanor, effectively shifting the burden onto her to manage perceived interpersonal issues instead of responding to the underlying problems being escalated.

68.     On May 17, 2024, Jeppesen participated in a leadership meeting attended by PRI U.S. board member, Wendy Cromwell ("Cromwell") and new Executive Team member, Allen-Ratzlaff. At one point, Ms. Cromwell voiced serious concerns on behalf of U.S. signatories that directly mirrored the issues Plaintiff had been raising for years—specifically, that UNPRI's Eurocentric nature and practice of dismissing U.S. signatories was harmful and ultimately placing

both the signatories and UNPRI at risk of legal exposure. She stated "U.S.-based signatories are telling us that we're Eurocentric . . . not listening . . . getting them in trouble." In response, Jeppesen agreed and made the additional whistleblower disclosure, acknowledged by Cromwell, that a chilling effect had taken hold at UNPRI, reiterating her belief that staff members feared professional repercussions and retaliation for speaking openly about internal issues, including the Eurocentrism[3] that resulted in discrimination against UNPRI employees on the basis of their national origin.

69.    Shortly thereafter, on May 22, 2024, Jeppesen met with Allen-Ratzlaff and made a second whistleblower disclosure. She reiterated concerns about systemic retaliation against U.S. team members for raising unwelcome feedback, national origin discrimination through marginalization of U.S. perspectives in organizational decision-making, suppression of U.S. signatory concerns, and exclusion of the U.S. market from leadership due to the lack of U.S. director-level representation. Jeppesen warned that UNPRI's "too Eurocentric" direction was creating escalating legal, regulatory, and fiduciary risks for U.S. signatories—many of whom, as public pension fiduciaries, faced statutory duties of prudence and loyalty—while alienating U.S. investors and jeopardizing nearly half of UNPRI's global signatory assets. She also disclosed her prior Grievance against Fowle and described ongoing retaliation, including pay suppression, blocked advancement, exclusion from market events, and enforcement of a gag order by Walton and others. Although Allen-Ratzlaff acknowledged these disclosures—admitting that UNPRI "should have been listening much more to the U.S. team" and that UNPRI's messaging had "cracks in [its] foundation" it had long ignored—she ultimately took no action.

70.    The following week, on May 31, 2024, at the end of her weekly catch-up with

---

[3] Eurocentrism describes a worldview that is centered on European values and regulatory perspectives.

Jeppesen, Walton raised the protected disclosures Jeppesen had made in the May 17 and May 22 meetings. Walton specifically referenced the May 22 discussion and stated, "I know you've spoken to Cambria recently...she told me you used the word 'retribution' . . . two times . . . that's like, that is illegal." Jeppesen corrected her and advised that she had discussed her concerns regarding *retaliation* within UNPRI with Allen-Ratzlaff. Walton responded negatively—clearly wanting to end the discussion—and stated "I'm sorry, I need to stop you . . . I just don't want to see any of this sort of commentary reflect poorly on you . . ." Walton's response was a clear threat and foreshadowing that Jeppesen's whistleblower disclosures could have the undesired consequences they ultimately did.

71.      In early September 2024, Plaintiff escalated extensive and specific critical feedback from a senior executive at a major U.S. signatory who had reported that UNPRI had ignored the strategy consultation input from their organization (and many others) and dismissed widespread pushback. The executive had stated that UNPRI frequently states that they make all decisions on the basis of signatory consultation, but that it frequently seemed that this was not actually true since so few changes in actual implementation based on feedback were evident, as compared to the originally presented plans. The signatory had also warned that its membership to UNPRI was being reconsidered. Jeppesen prepared a memo for the UNPRI Executive Team, including CEO Atkin and Chief Sustainable Systems Officer Fabian to convey this feedback. Allen-Ratzlaff insisted that certain direct criticisms of the CEO be redacted before sharing, but once the memo was actually sent, neither Atkin nor Fabian acknowledged receipt.

## G. UNPRI's Failure to Accommodate

72.      As a direct result of the prolonged threatening, abusive, and retaliatory conduct within a hostile work environment at UNPRI, Jeppesen experienced escalating psychological

symptoms, including anxiety, depression, insomnia, emotional distress, and stress-related speech disfluency. Though many of these conditions had been reported in the Grievance, they only continued to intensify with the escalating pattern of retaliatory conduct from UNPRI senior management in the time after the Grievance was filed.

73.    In January 2023, Jeppesen was formally evaluated and treated by a licensed clinical professional for Post-Traumatic Stress Disorder ("PTSD"). Jeppesen had been experiencing documented clinical symptoms, including hypervigilance, emotional flashbacks, panic attacks, and chronic sleep disruption—particularly in connection with work-related tasks, meetings, or attempts to speak about her experience at UNPRI. UNPRI was placed on notice of the emotional impact of its conduct when Jeppesen raised concerns about the psychological harm she was suffering in the Grievance and in various conversations with the People Team and senior leadership in 2021, 2022, and 2023.

74.    Specifically, as referenced above, during Jeppesen's July 15, 2022 meeting with Walton and Saa, she requested that UNPRI provide funding for her to consult a licensed psychologist and an independent, external career coach, in light of the significant trauma she had endured as a result of the years of documented workplace abuse; however, UNPRI did not provide these accommodations or engage in a meaningful dialogue regarding them. Instead, Walton directed Jeppesen to return with a proposal, explaining why the generic resources listed in Appendix 2 of the July 22 Misrepresentations, which consisted of a generic list of "mental health resources," available to all UNPRI employees, such as two internally trained "mental health first aiders" (including Hillier), two mental health days per year, the Employee Assistance Hotline, a global suicide prevention hotline, or counseling through her own health insurance. Although Appendix 1 referenced the option of a professional coaching program and UNPRI later agreed she

could have an external coach, it failed to follow through on that promise. Instead, UNPRI offered only discounted UNPRI-affiliated coaches, including one tied to Walton, and limited any external coach to a capped budget of approximately £1,500, the cost of one discounted series of UNPRI-affiliated coaching, a sum insufficient to secure a reasonable number of private, external sessions. As a result, UNPRI did not provide the psychologist or external coach Jeppesen had reasonably requested. Walton's instruction that Jeppesen justify why the generic resources were inadequate does not meet the legal standard for an interactive process under the law.

75.     As a result of UNPRI's refusal to engage in a meaningful dialogue regarding the reasonable accommodations sought, she continued—and continues—to suffer from significant emotional harm, reputational damage, and professional disruption, which includes recurrent panic attacks, disrupted sleep, stress-induced speech disfluency, and heightened anxiety.

**H.  UNPRI's Retaliation Against Jeppesen**

76.     On December 13, 2022 during a conversation between Jeppesen and Walton regarding Jeppesen's pay cut, Walton informed her that she had made certain members of UNPRI leadership "uncomfortable" in referencing the Grievance, specifically noting that Rose Easton, UNPRI's new Chief Signatory Relations Officer who was hired to replace Saa,  had expressed discomfort. Walton further suggested that she apologize to Ms. Easton by suggesting (incorrectly) that she tell Ms. Easton that she had merely been "triggered" and is working on moving on. During this conversation, Walton further confirmed that Jeppesen's restoration to her previous competency level (and commensurate salary) was conditioned on her compliance with the July 22 Misrepresentations. Specifically, Walton stated "we both have to abide by the [July 22 Misrepresentations] for this January review." The "January review" Walton mentioned was Jeppesen's Exceptional Retroactive Mid-Year Competency Rating Reassessment, scheduled for

January 2023. This retaliatory downgrade contributed to tangible financial harm, reputational damage, and emotional distress, and formed part of the broader pattern of unlawful retaliation and discrimination in violation of local and state law.

77.      During the January 24, 2023 re-assessment, the arbitrary decision was made by Easton and Drosu to only partially restore Jeppesen's competency rating at 1.02x—below her pre-Grievance level—based, not on performance (which Walton admitted as "very well regarded"), but instead on alleged "backslides" tied solely to Grievance references and her objections to the retaliatory and unprecedented relocation pay cut. Walton conceded that she did "not agree with it at all" and confirmed that the downgrade was "purely the result of the process [Saa] had put in place." She warned Plaintiff that further written objections to this decision "would not bode well," confirming the financially coercive and retaliatory nature of the downgrade and threatening further consequences. The decision resulted in a direct pecuniary loss to Plaintiff of approximately $5,000 for her engagement in protected activities.

78.      In March 2023, Jeppesen relocated from New York City to Denver, Colorado, largely to heal from the trauma of the years of substantiated workplace abuse and to avoid physically encountering Fowle. Prior to relocating, she had formally made the request on August 5, 2022 and was informed five days later—on August 10, 2022—that while she could relocate, doing so would subject her to an unjustified and discriminatory 10% reduction in pay, which UNPRI falsely claimed was consistent with internal policy. In practice, the purported policy was selectively enforced only against her and not applied to similarly situated employees who had relocated.[4] Rather, this relocation-based pay cut was imposed in retaliation for Jeppesen's prior

---

[4] Specifically, Policy Team member Greg Hershman moved from Washington, D.C. to Wilmington, DE and faced no salary change, despite the greatly decreased cost of living; Policy Team member Colleen Orr-Engel likewise moved from Washington, D.C. to Tucson, AZ and faced no salary change despite the greatly decreased cost of living; and Carly (Greenberg) Jacobs, who was initially hired onto Jeppesen's team before moving to a role in

protected activity, including filing the Grievance, submitting whistleblower disclosures, and resisting the fraudulent July 22 Misrepresentations by UNPRI leadership. Despite her senior role, long-standing contributions, and continued high performance, the salary reduction lacked any objective justification and further compounded the pattern of financial coercion and institutional hostility she had endured.

79.     On October 3, 2024, Jeppesen made a protected whistleblower disclosure when she raised concerns via Microsoft Teams to UNPRI's General Counsel in London regarding the imminent risk that UNPRI's handling of an invitation to a Chatham House Rule discussion on anti-ESG could expose U.S. investors to antitrust inquiries and create legal and reputational exposure for UNPRI. The following day, on October 4, 2024, Jeppesen faced retaliation for that October 3 disclosure when she was called into a meeting to be reprimanded by Allen-Ratzlaff and Walton. They instructed her to "put as little in writing as humanly possible" and avoid "burdening internal counsel." Jeppesen understood the meeting as a threat.

80.     On October 10, 2024, at a U.S. investment manager event Jeppesen had helped to organize, Walton reduced Plaintiff's participation to reading a brief disclaimer—publicly marginalizing her before approximately 50 industry leaders— in direct response to her October 3, 2024 protected whistleblower disclosure. Plaintiff nonetheless addressed the audience, introduced her team, and thanked them for their work, all in the face of a retaliatory effort to sideline her. These escalating acts of retaliation immediately followed Jeppesen's October 3, 2024 disclosure and occurred just weeks before she was notified on November 14, 2024, that her position was at risk of redundancy, underscoring the temporal proximity between her protected activity and her termination. UNPRI's retaliatory culture is recognized by employees beyond Jeppesen.  During a

---

Stewardship moved from Harrisburg, PA to Washington, DC and, in addition to facing no salary change, actually received additional "relocation funds" from UNPRI.

meeting on behalf of the organization's "Employee Engagement Committee," a U.S.-based employee expressed concern about the frequency at which retaliatory action is taken by UNPRI in response to negative feedback—a comment that, notably, was not directed toward, or made in reference to, Jeppesen.

## I.  UNPRI's Purported "Redundancy Round" and Post-Termination Defamation

81.    In November 2024, UNPRI abruptly announced a redundancy round, allegedly driven by a speculative £3 million budget shortfall projected for the next fiscal year, despite record top-line growth and expansion. UNPRI claimed that 17 employees had to be made redundant due to this projected deficit, a justification that fell apart when the organization proceeded to recruit over 40 new employees in the subsequent months, beginning less than a week after Jeppesen's termination, before the last of the impacted staff had even concluded their employments.

82.    Plaintiff was the only U.S. employee included in the redundancy round.

83.    Before the redundancy round commenced, Plaintiff learned that UNPRI would conduct the process in accordance with the U.K. Government Redundancy Guidelines, a legal framework binding in the United Kingdom (though not in the United States) that provides employees certain procedural protections including, but not limited to, (i) advance notice and consultation, (ii) redeployment opportunities, (iii) fair and objective scoring, (iv) right to a companion, and (v) redundancy pay.

84.    When Plaintiff questioned this decision, the People Team representative Raluca Drosu responded by informing her that UNPRI was using the U.K. Government Redundancy Guidelines globally as a "best practice," a decision that, according to the People Team, was meant to be "beneficial." To that end, in anticipation of her upcoming redundancy round, Plaintiff retained legal counsel to develop a strategic approach in accordance with the U.K. Government

Redundancy Guidelines.  As part of this strategy, Plaintiff worked with her attorney and spent over 25 hours of her own time to prepare, among other things, a redeployment proposal.

85.     UNPRI did not, however, adhere to the U.K. Government Redundancy Guidelines as promised.

86.     At the outset of the first redundancy meeting, on November 18, 2024, Walton stated that UNPRI had identified Katie Wheatley, then-Head of Canada, as the candidate for the newly combined Head of North America role based on a "skills assessment" in which no specific weightings or objective metrics were used. Although the process had been presented as an opportunity for employees to give feedback and propose redeployment alternatives, in actuality, the process was perfunctory and predetermined. Throughout the redundancy consultation, Plaintiff was presented with vague, pretextual criticisms—including "writing long emails," "not assuming best intent," and "being stuck on past issues"—all of which alluded to her history of protected disclosures and/or challenges to UNPRI's discriminatory practices. Walton further made clear that, according to herself and Allen-Ratzlaff, Jeppesen's ongoing references to the Grievance and related disclosures were viewed as grounds for termination, further confirming the retaliatory nature of her selection for termination. Walton even referenced that she and Allen-Ratzlaff had viewed Jeppesen's protected whistleblower disclosures as "perpetuating a narrative" about senior leadership avoiding U.S. signatories and their concerns, drawing a clear connection between Jeppesen's protected disclosures to Cromwell and Allen-Ratzlaff, on the one hand, and the redundancy process, on the other.

87.     On November 25, 2024, just before her 50th birthday, Plaintiff was terminated without notice and was cut off from all internal systems, compensation, and benefits, including healthcare reimbursements within five and a half hours, despite UNPRI's knowledge of Plaintiff's

disability, which was reflected in her employee records. Jeppesen's treatment starkly contrasted from the treatment of other terminated employees, who were permitted to remain in their roles for two or more additional weeks with full pay, benefits, and systems access. Additionally, all other terminated employees were able to leave neutral or personalized auto-reply messages, consistent with UNPRI's long-standing practice; however, Jeppesen's neutral message—stating only that she no longer worked at UNPRI and providing a personal forwarding email—was deleted. No replacement autoreply was set, and incoming emails were discreetly rerouted to Walton. This circumstances surrounding her termination confused external contacts, a fact that was confirmed when Plaintiff began receiving contemporaneous messages via LinkedIn, which expressed confusion about her status after e-mailing her at her former work address. This caused further reputation harm and disrupted her professional network.

88.      Rather than eliminate her position—*i.e.*, Head of U.S. Responsible Investment Ecosystems—Jeppesen's professional responsibilities were repackaged and redistributed among less experienced staff, including her former direct report.

89.      Specifically, Jeppesen's responsibilities were assumed by two much younger colleagues (in their early thirties), with significantly less experience and qualifications than Plaintiff. Katie Wheatley, based in Montreal, Canada, was preselected for the newly created consolidated Head of North America role, which eliminated Jeppesen's Head of U.S. position. Upon information and belief, Wheatley was never subject to any redundancy consultation meetings in connection with this process. Notably, this left UNPRI without any in-country dedicated U.S. leadership for its largest market. Just four months later, when Wheatley began her maternity leave, Shaska Chirinos—previously Jeppesen's direct report—was appointed as Co-Head of North America.

90.     Wheatley is approximately 19 years younger than Jeppesen, with only seven years' work experience (including two years at UNPRI), one direct report, and oversight of a market one-fourth the size of the U.S. market. She had no finance or U.S. investor background, and a resume rooted in social activism. She was objectively less qualified than Plaintiff, who brought over 25 years of financial services experience, nine years at UNPRI, experience successfully recruiting and managing five direct reports, deep relationships with leading U.S. signatories, and a solid understanding of fiduciary duty considerations. Ms. Chirinos is approximately 15 years younger and was likewise far less experienced.

91.     Of the 17 employees selected for redundancy, 12 (71%) were aged 40 or older and 6 (35%) were aged 50 or older. Upon information and belief, only about 33% of UNPRI's overall workforce was age 40 and older and roughly 10% were age 50 and older at that time, making the proportion of employees age 40 and above who were terminated markedly—and disproportionately—higher than their overall representation within the organization's staff.

92.     The post-redundancy hiring surge reveals that the redundancy process was not a legitimate financial or organizational necessity, but rather a pretextual mechanism selectively applied, in some cases, to target perceived dissenters. In Jeppesen's case, the redundancy process was weaponized in retaliation for her prior protected activity, including the Grievance, her disclosures regarding regulatory, legal, and governance risks, and her resistance to unlawful and fraudulent misrepresentations issued by senior leadership. UNPRI's decision to eliminate her role—while expanding headcount across the organization—reflects discriminatory and retaliatory animus, rather than any bona fide economic rationale.

93.     On November 21, 2024, during Jeppesen's formal redundancy consultation attended by the People Team representative Raluca Drosu and colleague Mark Green, she calmly

raised concerns about the fairness of the process, the lack of transparency in the selection criteria, and UNPRI's obligations under U.S. anti-retaliation law. In response, Walton falsely stated "I don't know how to answer all of these questions, Carol, they sounded very threatening." This implication of misconduct was false and reputationally damaging. Thereafter, an employee within UNPRI's Americas team privately informed Plaintiff that Walton had repeated this statement to her, stating that "the tone the consultation took necessitated an abrupt ending," further advancing a false narrative suggesting insubordination.

94.     Other misleading statements followed. The UNPRI CEO and Walton internally attributed the 17 redundancy terminations to a £3 million budget shortfall, but publicly framed the layoffs as "planned," "considered," and in pursuit of "efficiency"—all terms that imply performance-based culling in the financial sector. These statements were published in Responsible Investor Magazine on December 6, 2024, which was particularly damaging to Jeppesen.

95.     The circumstances surrounding Plaintiff's termination caused her to experience acute distress marked by feelings of humiliation, betrayal, and loss of professional identity after dedicating nearly a decade to building UNPRI's U.S. presence. The timing of the termination— during a major U.S. holiday and immediately before her milestone birthday—compounded the psychological impact, intensifying feelings of isolation and grief. Plaintiff has since endured ongoing anxiety, depression, and sleep disruption, requiring sustained therapeutic intervention. In fact, in July 2025, a board-certified psychiatrist who is the Deputy Chief of Staff at a U.S. Department of Veterans Affairs hospital and an expert in PTSD evaluated Jeppesen and linked her trauma/stressor-related disorder directly to Defendants' retaliatory acts and hostile termination. Plaintiff continues to receive treatment at her own expense and has suffered economic loss, reputational harm, and lasting impairment in her ability to work in her profession.

### J. **Blacklisting**

96.     Thereafter, a UNPRI colleague who witnessed Jeppesen's termination remarked that it "seemed punitive, like an escorted removal from the premises by security." This perception among colleagues underscored the reputational harm caused by the manner in which her termination was carried out.

97.     Jeppesen has been unable to re-engage in the market on equal footing with other similarly situated peers in the industry. UNPRI's false and defamatory messaging combined with its failure to publicly acknowledge her departure materially interfered with her ability to secure future employment and has irreparably impacted her reputation in the small, close-knit industry. Prior to her termination, Plaintiff was frequently approached for high-profile, executive-level roles; however, after she was sidelined in favor of Walton's promotion to Director of Americas, the level of recruiter interest she had previously experienced noticeably declined.

98.     To date, Jeppesen remains unable to obtain a credible reference from a direct line manager after more than nine years of service to UNPRI. In fact, after a former colleague offered to write a recommendation, that offer was rescinded in writing days later, citing fear of surveillance and referencing internal pressure to remain silent. Multiple journalists—including one from Responsible Investor Magazine—independently reached out, referencing "rumblings in the market" surrounding Jeppesen's departure. In light of the foregoing, Plaintiff's reputation and career trajectory has been irreparably damaged by Defendants.

### FIRST CLAIM FOR RELIEF
### (Discrimination in Violation of the NYSHRL)

99.     Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 98 above.

100.    At all relevant times, the New York State Human Rights Law ("NYSHRL") was in

full force and effect and applied to Defendants' conduct.

101.    At all relevant times, Defendants were "employer[s]" for purposes of § 292(5) of the NYSHRL, and, to the extent the Individual Defendants were not "employers" under the NYSHRL, they are liable as aiders and abettors of discrimination against Jeppesen.

102.    At all relevant times, Jeppesen was a "person" and an "employee" of Defendants for purposes of §§ 292(1) and 292(6) of the NYSHRL.

103.    Defendants discriminated against Jeppesen on the basis of her age, gender, disability, and national origin in violation of the NYSHRL by, *inter alia*, subjecting her to unequal terms and conditions of employment, decreasing her wages, diminishing her professional responsibilities, fostering and condoning severe and pervasive discriminatory conduct, failing to remedy substantiated workplace harassment, imposing retaliatory pay cuts and speech restrictions, and ultimately terminating her employment.

104.    The discriminatory conduct included verbal abuse, exclusion from meetings, undermining her professional authority, systemic failure to address a substantiated grievance, and other actions that created and perpetuated a hostile and demeaning work environment because of her protected characteristics.

105.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Jeppesen has suffered, and continues to suffer harm including, severe mental anguish and emotional distress, for which she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
**(Discrimination in Violation of the NYCHRL)**

106.    Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 105 above.

107.    At all relevant times, the New York City Human Rights Law ("NYCHRL") was in full force and effect and applied to Defendants' conduct.

108.    At all relevant times, Jeppesen was a member of a protected class.

109.    Defendants discriminated against Jeppesen on the basis of her age, gender, disability, and national origin in violation of the NYCHRL by, *inter alia*, subjecting her to disparate treatment in terms, conditions, and privileges of employment, including but not limited to, decreasing her wages, diminishing her professional responsibilities, fostering and condoning severe and pervasive discriminatory conduct, failing to remedy substantiated harassment, imposing retaliatory pay cuts and speech restrictions, and ultimately terminating her employment.

110.    The discriminatory conduct included bullying, verbal abuse, exclusion, undermining her authority, coded and pretextual criticisms, isolation from leadership opportunities, and other treatment that caused her to be treated less well than other employees because of her protected characteristics.

111.    Each of the Individual Defendants participated in encouraged, condoned, or failed to act to stop the discrimination and is therefore liable under NYCHRL § 8-107(6) as an aider and abettor.

112.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Jeppesen has suffered, and continues to suffer, harm for which she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Failure to Accommodate in Violation of the NYSHRL)

113.    Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 112 above.

114.    The NYSHRL provides: "It shall be an unlawful discriminatory practice for an employer . . . to refuse to provide reasonable accommodations to the known disabilities, or pregnancy-related conditions, of an employee." N.Y. Exec. L. § 296(3)(a).

115.    Jeppesen is disabled within the meaning of § 292(21) of the NYSHRL.

116.    In seeking funding for basic psychiatric counseling and an external career coach, Jeppesen requested reasonable accommodation for her disability that, if granted, would have enabled Jeppesen to perform the essential functions of her job.

117.    Despite having notice of Jeppesen's disability, Defendants refused to provide the accommodations she requested or meaningfully engage in a discussion regarding her requests.

118.    Individual Defendants who were aware of and denied or failed to act on these requests are liable as aiders and abettors under NYSHRL § 296(6).

119.    As a direct and proximate result of Defendants' failure to accommodate her disability, Jeppesen has suffered, and continues to suffer, economic harm for which she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

120.    As a direct and proximate result of Defendants' failure to accommodate her disability, Jeppesen has suffered and continues to suffer severe mental anguish and emotional distress for which she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Failure to Accommodate in Violation of the NYCHRL)

121.    Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 120 above.

122.    The NYCHRL requires employers to make reasonable accommodations for

employees with disabilities, and mandates that employers engage in a cooperative dialogue with the employee before reaching a determination about such requests. New York City Administrative Code §§ 8-107(15); 8-107(22); and 8-107(28).

123.    Jeppesen requested multiple reasonable accommodations, including but not limited to support for mental health care related to her PTSD symptoms, including a psychologist and an independent career coach.

124.    Defendants failed to engage in a good-faith cooperative dialogue regarding any of these requests, and in most cases, flatly denied them—despite having actual notice of Jeppesen's pregnancy-related and disability-related needs.

125.    Defendants' failure to accommodate Jeppesen's known needs, and failure to engage in the legally required dialogue, violated the NYCHRL.

126.    Individual Defendants who participated in these denials or failed to respond in good faith are liable under NYCHRL § 8-107(6) as aiders and abettors.

127.    As a direct and proximate result of Defendants' conduct, Jeppesen has suffered and continues to suffer economic harm, emotional distress, reputational damage, and other non-economic injuries, for which she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**(Failure to Engage in Cooperative Dialogue in Violation of the NYCHRL)**

128.    Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 127 above.

129.    Under the NYCHRL, an employer must engage in a timely, good-faith cooperative dialogue with an employee who requests an accommodation based on disability. N.Y.C. Admin. Code §§ 8-107(22) and 8-107(28).

130.    Jeppesen made multiple requests for accommodation due to known disability related conditions.

131.    Defendants failed to initiate or participate in a cooperative dialogue concerning any of these accommodation requests.

132.    In most instances, they responded with outright denials or perfunctory gestures, rather than meaningful engagement as required by law.

133.    Defendants' failure to engage in a cooperative dialogue violated § 8-107(28) of the NYCHRL.

134.    The Individual Defendants who knowingly failed to initiate or participate in the cooperative dialogue process are liable under NYCHRL § 8-107(6) as aiders and abettors.

135.    As a direct and proximate result of Defendants' unlawful conduct, Jeppesen has suffered and continues to suffer economic harm, emotional distress, reputational damage, and other non-economic injuries, for which she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
**(Retaliation in Violation of the NYSHRL)**

136.    Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 135 above.

137.    The NYSHRL provides: "It shall be an unlawful discriminatory practice . . . to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article[.]" N.Y. Exec. Law § 296(7).

138.    Jeppesen engaged in protected activity under the NYSHRL by, including, without limitation, disclosing the discriminatory conduct she was experiencing from her manager,

Christopher Fowle and to UNPRI leadership; making whistleblower disclosures in October 2022; requesting mental health accommodations in 2022; objecting to discriminatory pay reduction in connection with relocation; raising protected concerns with Cromwell and Allen-Ratzlaff in May 2024; reporting retaliation and governance failures to UNPRI's General Counsel, in October 2024; and making further protected disclosures during her redundancy consultation meetings in November 2024.

139.    The formal grievance filed by Jeppesen in December 2021 detailing Mr. Fowle's harassment was formally investigated and substantiated by UNPRI in February 2022.

140.    Defendants retaliated against Jeppesen for engaging in the foregoing protected activity by, *inter alia*, decreasing her wages, diminishing her professional responsibilities, and ultimately terminating her employment.

141.    Individual Defendants who participated in, directed, or knowingly permitted retaliatory acts were liable as aiders and abettors under NYSHRL § 296(6).

142.    Defendants' conduct expressly violates N.Y. Exec. L. § 296.

143.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Jeppesen has suffered, and continues to suffer, economic harm for which she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

144.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Jeppesen has suffered and continues to suffer severe mental anguish and emotional distress for which she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**
**(Retaliation in Violation of the NYCHRL)**

145.    Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 144 above.

146.    The NYCHRL provides, "It shall be an unlawful discriminatory practice . . . to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter[.]" New York City Administrative Code § 8-107(7).

147.    Jeppesen engaged in protected activity under the NYCHRL by, including, without limitation, complaining to UNPRI leadership about discriminatory conduct on behalf of her manager, Christopher Fowle.

148.    One grievance filed by Jeppesen in December 2021 detailing Mr. Fowle's harassment was formally investigated and substantiated by UNPRI in February 2022.

149.    Defendants retaliated against Jeppesen for engaging in the foregoing protected activity by decreasing her wages, diminishing her professional responsibilities, and ultimately terminating her employment.

150.    Each of the Individual Defendants is liable under NYCHRL § 8-107(6) as an aider and abettor to the extent they participated in, condoned, or failed to prevent retaliation against Jeppesen.

151.    Defendants' conduct expressly violates New York City Administrative Code § 8-107(7).

152.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Jeppesen has suffered, and continues to suffer, economic harm for which she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

153.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Jeppesen has suffered and continues to suffer severe mental anguish and emotional distress for which she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
**(Whistleblower Retaliation in Violation of NYLL § 740)**

154.    Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 153 above.

155.    New York Labor Law (NYLL) § 740 provides, "An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law." NYLL § 740.

156.    Jeppesen engaged in protected activity under NYLL § 740 when she made good-faith disclosures to UNPRI leadership regarding unlawful activity, including numerous instances of discriminatory and retaliatory conduct in the workplace. These disclosures included, but were not limited to, reports that (i) UNPRI's U.S. maternity leave policy violated the New York Paid Family Leave law; (ii) UNPRI's failure to provide a private lactation space violated New York Labor Law § 206-c; (iii) UNPRI's Eurocentric governance practices were exposing U.S. signatories, including public pension funds, to fiduciary and regulatory risks; and (iv) UNPRI's U.S. employees were retaliated against for raising the concerns of the U.S. signatories.

157.    Defendants retaliated against Jeppesen for engaging in the foregoing protected activity by, *inter alia*, decreasing her wages, diminishing her professional responsibilities, and ultimately terminating her employment.

158.    To the extent that any of the Individual Defendants exercised supervisory authority or control over the terms and conditions of Jeppesen's employment, they may also be liable as "employers" under NYLL § 740.

159.    As a direct and proximate result of Defendants' unlawful retaliatory conduct— which was undertaken deliberately, willfully, maliciously, and in reckless disregard of Plaintiff's rights in order to silence her protected activity—Jeppesen has suffered, and continues to suffer, economic harm. Accordingly, she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

160.    As a further direct and proximate result of Defendants' unlawful retaliatory conduct, Jeppesen has suffered and continues to suffer severe mental anguish and emotional distress. She is therefore entitled to monetary damages for emotional distress, as well as punitive damages  to the fullest extent permitted by law, in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF
### (Defamation)

161.    Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 160 above.

162.    As described above, Defendants have made false statements about Jeppesen.

163.    Defendants published their false statements to third parties.

164.    Defendants made their false statements with actual malice and with an intentional or reckless disregard for the truth.

165.    Defendants' false statements constitute defamation *per se* in that the statements tend to injure Jeppesen in her trade, business, or profession.

166.    To the extent that any of the Individual Defendants personally made, repeated, authorized, or facilitated the publication of such false statements, they are individually liable for

defamation.

167.    As a result of Defendants' false and defamatory statements, Jeppesen has suffered economic harm for which she is entitled to monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

### TENTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)

168.    Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 167 above.

169.    By the acts and practices alleged herein, and particularly those acts related to Plaintiff's abrupt and outrageous termination, Defendants engaged in extreme and outrageous conduct that went beyond all possible bounds of decency and was intended to, or recklessly disregarded the likelihood it would, cause Plaintiff severe emotional distress.

170.    As a direct and proximate result of Defendants' conduct, Jeppesen experienced severe and ongoing emotional and physical harm, including anxiety, depression, panic attacks, sleep disruption, stress-related speech disfluency, and other symptoms requiring sustained therapeutic intervention.

171.    Plaintiff's injuries were further aggravated by the cumulative impact of years of workplace harassment, retaliation, and toxic conditions, combined with Defendants' ongoing and blatant disregard for her disability and wellbeing.

172.    By the acts and practices alleged herein, Defendants intentionally or recklessly disregarded the likelihood that their actions would lead to severe emotional distress on the part of Jeppesen.

173.    To the extent any of the Individual Defendants personally engaged in or directed

this extreme and outrageous conduct, they are individually liable for intentional infliction of emotional distress.

174.    Defendants are liable to Jeppesen for intentional infliction of emotional distress and for the resulting monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### (Fraud)

175.    Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 174 above.

176.    As set forth in detail above, Defendants transmitted documents to Jeppesen in July 2022 (again, the "July 22 Misrepresentations") that outlined restrictions on her ability to speak about the harassment she suffered at the hands of Mr. Fowle and the circumstances surrounding Mr. Fowle's departure from UNPRI.

177.    Upon information and belief, Individual Defendants Saa, Walton, and Hillier knowingly misrepresented to Jeppesen the source and nature of the July 22 Misrepresentations by, *inter alia*, (i) falsely presenting the restrictions contained therein as legally binding, (ii) falsely indicating the restrictions were based on legal advice from both U.S. and U.K. counsel, and (iii) issuing real and direct threats that non-compliance with the July 22 Misrepresentations would lead to disciplinary action.

178.    Upon information and belief, Defendants, including, but not limited to, Saa, Walton, and Hillier, had actual knowledge—or, by virtue of their seniority, constructive knowledge—that the foregoing misrepresentations were false and solely made to induce Jeppesen to remain silent about the rampant abuse she suffered at UNPRI, which she did to her detriment.

179.    As set forth in detail above, Jeppesen complied with the July 22 Misrepresentations

by, *inter alia*, self-censoring her communications and deliberately refraining from engaging private counsel.

180.    Understanding the July 22 Misrepresentations to be binding workplace directives issued by her employer, Jeppesen's reliance on Defendants' misrepresentations was both reasonable and justifiable.

181.    Individual Defendants who personally authored, transmitted, or knowingly caused the July 22 Misrepresentations to be delivered are individually liable for fraud.

182.    Jeppesen suffered injury and damages as a direct and proximate result of Defendants' false representations, in an amount to be proven at trial. Specifically, in reliance on Defendants' false statements, Plaintiff accepted a reduction in compensation that she would not have otherwise, if not for the July 22 Misrepresentations, resulting in a total loss of $5,000. Plaintiff also lost professional opportunities as a result of Defendants' fraudulent scheme, since she was unable to adequately advocate for herself or satisfactorily represent her career trajectory. These losses were reasonably foreseeable and were the natural and probable consequence of Defendants' conduct. Accordingly, Plaintiff is entitled to recover monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

## TWELFTH CLAIM FOR RELIEF
### (Promissory Estoppel)

183.    Jeppesen repeats and realleges the allegations set forth in Paragraphs 1 through 182 above.

184.    The People Team's representations that the U.K. redundancy process applied globally and, thus, to all employees, constitutes a clear, unambiguous promise on behalf of UNPRI that the U.K. redundancy process would apply to Plaintiff.

185.    Plaintiff reasonably and foreseeably relied on this assurance by preparing for a redundancy process that would be governed by U.K.-specific procedures, including, but not limited to, engaging an attorney to assist in developing a redeployment plan and to strategize as to other aspects of the U.K.-specific procedures.  In doing so, Plaintiff incurred considerable expenses including, without limitation, attorney's fees.

186.    UNPRI knew or reasonably should have known that Plaintiff would rely upon their unambiguous promises and assurances and, in turn, expend funds in preparing for the U.K. redundancy process.

187.    Accordingly, Plaintiff is entitled to recover monetary damages, including, without limitation, punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial.

**WHEREFORE**, Jeppesen demands judgment, awarding her compensatory damages, including damages for emotional distress, in an amount to be determined at trial; awarding her punitive damages to the extent permitted by law; awarding her pre- and post-judgment interest; and granting such other or further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Jeppesen demands a trial by jury.

Dated: New York, New York
          August 25, 2025

PRYOR CASHMAN LLP

By: _LaKeisha M.A. Caton_
         LaKeisha M.A. Caton
         Lara Kasten Hoffman
         7 Times Square
         New York, New York 10036
         (212) 421-4100

*Attorneys for Plaintiff Carol Jeppesen*